**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ERNST DORCELY,                                    :          CIVIL ACTION NO:
    Plaintiff,                              :
                                                         :
V.                                                :          3:03 CV 114 (AVC)
                                                          :
FIRST UNUM LIFE INSURANCE COMPANY,   :
    Defendant.                              :          June 15, 2004

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**SUBMITTED IN SUPPORT OF ITS MOTION FOR**
**JUDGMENT ON THE ADMINISTRATIVE RECORD**

1.    <u>PROPOSED FINDINGS OF FACT</u>

                                                                           **SOURCE**[1]

1.    Plaintiff, through his employer, UBS AG, submitted an application for    1-5
       benefits under the Policy on or about May 18, 2000.  In that
       application, his employer stated that his last day of work was
       February 21, 2000.

2.    Along with the application, plaintiff submitted a statement from Dr.    8
       Michael Swerdin, his attending physician, who indicated that plaintiff
       demonstrated objective medical findings of "persistent uveitis left
       eye with decreased vision and glaucoma. History of trauma to left
       eye with cataract removal 1/00."

---

[1] Numerical citations are to the Administrative Record prepared and compiled below.

1

3.    Unum assigned Carla Tyler-Bailey to process plaintiff's claim for            15
      short term disability benefits.  She spoke with plaintiff on May 23,
      2000.  In that conversation he told her that he was diagnosed with
      glaucoma, that his last day of work was February 21, 2000, and that
      his attending physician had disabled him as of February 21, 2000.
      Based on that conversation and the materials plaintiff, his employer
      and his attending physician had presented, Ms. Tyler-Bailey as of
      that date, she approved short term disability benefits for 6 weeks.

4.    Unum thereafter assigned the plaintiff's claim to its Long Term
      Disability Unit for analysis.  On August 16, 2000, Tracy Balboni, one
      of Unum's Long Term Disability Customer Care Specialists, wrote  to
      plaintiff:

             We have received the claim from Short Term
             Disability....Please note that receipt of short term disability
             benefits does not automatically mean that your long term
             disability claim will be approved. Long term disability
             coverage differs from short term disability coverage. Your
             claim will be subject to the policy provisions in your long term
             disability policy.

5.    Plaintiff's employer, UBS AG, completed an Educational                       29-31
      Employment History Form and provided it to Unum.  In that form,
      UBS AG indicated that plaintiff's position was as a "Customer
      Service Representative." His annual salary was $60,000. In his job,
      he used a  computer server with different softwares. His job duties
      involved speaking "to customer and solve their banking problem in
      four different languages."  The physical requirements of his position
      were "Keen eyes with ability to quickly recognize problem and solve
      them using banking laws and regulations."

6.  On August 29, 2000, Balboni spoke with plaintiff.  He told her that         39-45
    his eye symptoms began in January 1997 with an accident at work.
    There was construction being done and debris fell into his left eye.
    He had hired a workers' compensation attorney and was denied
    workers' compensation benefits.

    Plaintiff told Balboni that he had undergone 5 surgeries on his left
    eye, the last one in April of 2000.  His left eye burns and is sensitive
    to light, and he also "has problem with right eye as well."   He told
    her that he has eye drops in left eye three times a day; 3 types of
    drops. He also takes one drop for right eye. "Takes Tylenol for
    headaches."

    Plaintiff described his activities of daily living.  He

    > stays inside. Closed windows. Can't drive. # months behind
    > on bills. Father helps when he can't. He lives alone. Vision
    > blurry out of left eye. Wears a patch when pain is
    > bad–Approximately 2 days/week. When pain is bad, eye
    > waters and needs to stay in bed. Attorney Fox is his workers
    > comp attorney.

7.  Unum received a Job Analysis from Ruth Ann Shay, Director UBS            47-50
    Warburg, dated September 12, 2000.  In that Analysis, Ms. Shay
    stated that plaintiff's job title was "Customer Service
    Rep/Investigator."  The minimum qualifications for that position were
    "Language skills, PC applications ability, telephone skills."  As a
    Customer Service Rep/Investigator plaintiff deals "with customer
    inquiries regarding US dollar payments, queries received by a
    telephone electronically or manually."  Shay went on to describe the
    physical duties of plaintiff's job as sedentary.

8.    On September 25, 2000, Balboni wrote to plaintiff that:    52-53

>   Enclosed you will find a copy of a letter we sent you concerning Unum Disability Benefits. We advised you in that letter that we needed to receive proof of your disability within 30 days of our request. Since we have not received the requested information within the specified time period, we are closing your file in accordance with the following policy revision:
>
>   "Notice & Proof of Claims...Proof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for the proof...."
>
>   If you are still interested in pursuing your claim for disability benefits, please provide us with the necessary information immediately to support your claim.... If First Unum does not receive your written appeal within 90 days of the date of this letter, our claim decision will be final. If the information we receive does not enable us to alter our determination, we will forward your file for an independent, impartial and final appeal review.

9.    Balboni attempted thereafter to contact the plaintiff by telephone but was unable to reach him or to leave a message for him.    54

10.   Commencing the end of December, 2000, plaintiff began to contact Unum regarding his claim for benefits.    58-67

11.   Unum assigned another Disability Benefits Specialist, Kathleen Reid, to the plaintiff's file in January, 2001.    73-78

12.   Reid spoke with plaintiff on January 18, 2001. In that conversation he told her that "he has seen a retina specialist 3 times. They have put him on a lot of meds. This is the least amount of pain he has been in for months and it is only now that he can attend to these issues"    71-72

>   Reid told plaintiff that the "burden is on him to provide proof of disability. Then is contractual issue of whether or not he is disabled."

13. Reid faxed an Attending Physician's Statement to Dr. Swerdin on January 22, 2001.   83-84

14. On January 25, 2001, Reid received a fax from Dr. Swerdin's office that "Dr. Swerdin will not fill out any more forms. Faxing letter."   91

15. Thereafter, Dr. Swerdin sent Unum a hand written letter in which he wrote:   92

> Ernst Dorcely is a 38 year old male who has a past ocular history of trauma to the left eye with cataract removal and posterior chamber intraocular lens implant back in January 2000. He has been followed at my office since February 2000.
>
> Medical Records Summary from February 2000 to Present:
> Mr. Dorcely has at least 20/40 vision right eye with 20/200 vision left eye. The right eye exam is normal. However, in the left eye he has been treated for retinal edema, residual iritis and glaucoma in the left eye causing decreased vision and glare.
>
> Activities He Can and Cannot Do:
> Due to decreased vision in the left eye it may be difficult to perform extensive reading or viewing of a computer screen. Based on his visual acuity, most physical activities could be performed except for operating machinery which can pose a risk.
>
> Treatment Plan:
> Mr. Dorcely is taking 3 different eyedrops in the left eye. Voltaren twice a day, Alptoyen twice a day, and Timoptic XE once a day. He will be rechecked March of 2001. At this time it is possible the decreased vision in the left eye may be chronic without any improvement. In 3 months vision will be reevaluated.

5

16. Unum requested that its vocational consultant conduct a vocational review of the plaintiff's position as it existed in the national job market. On January 29, 2001 it received a response from Douglas Palmer, MS, CRC. In it, Palmer wrote:   100

> The material duties of occupation of Wire Transfer Clerk include transferring funds or securities and maintains records of transactions using computers. The physical demands for this occupation are considered sedentary with occasional lifting up to 10 pounds, frequent fingering, occasional reaching and handling, and sitting up to 2/3rds of the time. In regards to the visual requirements for this occupation, the Dictionary of Occupational Titles reports that frequent near acuity is needed, which is defined as clarity of vision at 20 inches or less.

17. On February 8, 2001, Unum's medical consultants, Maliea Brackett, RN and Ann Pidgen, RN , completed a review of the medical information contained in the plaintiff's file. In part, they wrote   101-102

> Clinical Findings: Has history of trauma to left eye. January '00 cataract removal and posterior chamber intraocular lens imprint left eye. As of 2/29/00, visual acuity showed 20/50 in right eye and 20/80 in left eye. As of 12/15/00 visual acuity shows 20/50 in right eye and 20/80+ in left eye.
>
> Narrative of 12/26/00: Attending Physician indicates 20/40 in right eye and 20/200 in left eye.
> Claimant presently on Voltaren, Alphagan, and Timoptic XE.
>
> Restrictions and Limitations: Restrictions are extensive reading or viewing of computer screen. Limitations are operating machinery.
>
> Conclusion: The available medical information provided from 2/29/00-12/26/00 does not indicate significant change in claimant's condition, nor would I expect claimant to be totally impaired based on review of these medicals.

6

18.  Unum also requested that a physician review the medical        102
     information in the plaintiff's file.  On February 16, 2001, Lawrence
     Broda, MD, wrote:

          While claimant has decreased vision, left eye, albeit
          unreliable exams, should be able to read with normal right
          eye and use computer screen. If problems are biocular vision
          because of differences between eyes, could use patch to be
          able to focus with one eye. No need for prior records following
          discussions.

19.  Dr. Broda's February 16 report was based on a telephone call he     103-104
     had on February 14, 2001 with plaintiff's attending physician, Dr.    105-106
     Michael Swerdin.  Dr. Broda's notes of the two physicians'
     conversation contain the following entry:

          Analysis of data and restrictions and limitations: "Inconsistent
          visual acuities and unknown preoperative visual occuity."

          Clinical Findings: History of unspecified eye trauma 1997.
          Lens implant following cataract extraction 01/20/00 by
          Sanjeev Nath, MD. Subsequently followed by Michael
          Swerdin, MD. Phone call to Dr. Swerdin to clarify eye
          findings. Claimant does have evidence of prior left eye
          trauma and surgery, residual retinal edema and iritis of
          uncertain duration. His eye exams have been unreliable. His
          right eye vision is diminished by eye testing (not totally
          objective-patient can influence) but his right eye appears
          normal, raising question of patient reliability. Dr. Swerdin can't
          determine if vision changes [are] real based on patient
          reliability and has been unable to obtain records from Dr.
          Nath to see what was his previous vision. Office visit 12/29/00
          reveals uncorrected acuity 20/50 right and 20/80 left with
          refraction. Visual acuity 20/30 right and 20/50 left with
          questionable reliability. Vision of office visit 12/15/00
          uncorrected was 20/60 right and 20/100 left by technician,
          and when refracted with Dr. Swerdin 20/40 right and 20/200
          left which is inconsistent.

7

20.   On or about February 16, 2001, Douglas Palmer, Unum's vocational    109
      consultant, spoke with Dr. Broda.  Thereafter, he prepared an
      addendum to his January 29 report:

> Based on discussion with Broda, it would appear reasonable
> that an individual with loss of vision in one eye would learn to
> accommodate vision with the other eye that would enable
> him/her to be able to perform the material and substantial
> duties of this occupation that would require frequent near
> acuity with monocular vision.

21. On February 16, 2001, Unum wrote to plaintiff to inform him that it     114-116
    was denying his claim and to explain the basis of that decision.  In
    part, Unum wrote:

> Your claim for LTD benefits was originally denied on 9/25/00
> for failure to provide proof of disability. On 1/19/01, we
> received office notes from Dr. Swerdin and on 01/25/01 we
> received a disability statement from him. Dr. Swerdin
> documented that he has tried without success to obtain
> medical information from your prior doctor documenting your
> condition and treatment prior to his treatment. Based on this it
> is unclear for how long you have had retinal edema and iritis
> and whether or not you were able to work with your conditions
> previously.

> Your visual acuity has been tested during each office visit
> with Dr. Swerdin, and he has documented the unreliability of
> your answers. Specifically, on 12/15/00, your uncorrected
> vision of 20/60 in your right eye and 20/100 in your left eye.
> With refraction, your right improved to 20/40 however, your
> left eye worsened to 20/200 which is inconsistent.

> At this time, we have no objective evidence to support you
> have any restrictions or limitations regarding your right eye.
> Again, due to the fact there is no medical in the file prior to
> 2/29/00, there is no indication when the retinal edema and
> iritis developed in your right eye. Furthermore, we have
> reviewed your occupation prior to your disability and have
> determined that you are performing the material duties of a
> Wire Transfer Clerk (DOT # 203.562-010) which does require
> frequent near acuity. However, it is reasonable that with a
> reported loss of vision in one eye, an individual could
> accommodate their vision to perform the material duties of
> this occupation.

> Therefore, at this time, we do not have objective evidence to
> support you would have restrictions and limitations due to
> your eyesight that would prevent you from performing the
> material duties of your regular occupation. We are denying all

liability as of the date of this letter and no benefits will be payable to you.

If you have new, additional information to support your request for disability benefits, please send it to my attention at the address noted on this letterhead.

22. On Feburary 19, 2001, Reid spoke with the plaintiff by telephone to explain Unum's decision.  In a memo summarizing the substance of that telephone call, she wrote:

119-120

> Called claimant back and explained denial of claim. Reviewed medicals submitted and inconsistencies and explained we would expect he could do his own occupation with right eye if he did have objective evidence of restrictions and limitations with his left eye. He says he tried to do his job for three years and got poor evaluations. He thought they were going to fire him. The speed was no longer there. Supervisor told him to get further medical follow-up, which was further surgery. Pain has been unbearable. Technical job he was doing, made decisions in lending and correct problems, that is very very technical. Could not do job.  Left eye is for short vision, right eye is for long vision. Has had 4 operations of his left eye. Job contributed to my problem. Has had fluid at back of left eye and has had 5 operations on left eye. $50,000 for additional surgery. His eye does not compensate as he did not loose left eye. He is going to get a lawyer and sue. He asked if we had info from surgeon who did surgeries. No. He asked if we had info from specialist. No. He said he will have both send info and will appeal decision.

23. On February 22, 2001 plaintiff appealed Unum's decision by facsimile with attachments.  On the cover sheet, plaintiff wrote, "I am appealing latest decision on my claim and request immediate payment. I am submitting further particulars. However you should contact doctor or doctors for more if needed."    122-129

   Along with that cover sheet, plaintiff submitted:

   • a statement "as of" December 16, 1999 of payments made by Connecticut General Life Insurance Company for "outpatient services" that Dr. Sanjeev Nath provided on 12/1/99;    128

   • a bill from New York Eye and Ear Infirmary dated 10/17/00 indicating a payment of $173.25 for services provided on 6/17/99;    127

   • A statement from Connecticut General Life Insurance Company "as of" September 20, 2000 regarding services Dr. Edward Stroh performed on 9/8/00;    126

   • A statement from Connecticut General Life Insurance Company "as of" October 12, 2000 that indicates that Dr. Roger Lash provided "assist surg outpat" services to plaintiff on 6/17/99;    125

   • A statement from Connecticut General Life Insurance Company "as of' October 23, 2000, that indicates that Dr. Sanjeev Nath provided outpatient surgery on 6/17/99.    124

24. Plaintiff had not as of February 22, 2001 provided Unum with any medical reports or information from any physician mentioned in his "appeal," nor did he in that "appeal" provide Unum with any medical information from any physician.

11

25.    On February 24, 2001, Reid wrote to plaintiff that, "We have          130
       received your request for an appellate review. As you have not
       submitted any new medical information, this request and your claim
       file have been sent to Quality Performance Support Unit for
       completion of the appellate review."

26.    On March 2, 2001, Ronald Hamel, Senior Appeals Specialist in          131
       Unum's Quality Performance Support Unit, acknowledged plaintiff's
       request for appeal.

27.   On March 16, 2001, Hamel wrote to plaintiff to indicate Unum had      133-134
       completed its review of its denial of benefits and determined that the
       decision to deny the claim was appropriate.  In part, Hamel wrote:

              According to the policy under which you are covered:

              "Disability" and "disabled" mean that because of injury or
              sickness:
              1) the insured cannot perform each of the material duties of
              his regular occupation; and
              2) after benefits have been paid for 24 months, the insured
              cannot perform each of the material duties of any gainful
              occupation for which he is reasonably fitted by training,
              education or experience.

              Since you have not submitted any new medical information
              for your appeal, this decision is based on a thorough review
              of the information currently in your file.

              As outlined in your previous correspondence to you dated
              2/16/01, the objective medical evidence does not support that
              you are incapable of performing the material duties of your
              regular occupation.

              The medical records from Dr. Swerdin indicate that you have
              a history of eye trauma to the left eye with cataract removal
              and insertion of an intraocular lens implant.  Your left eye has
              been treated for retinal edema, residual iritis and glaucoma.
              On examination, your right eye is normal.

              On 12/15/00, Dr. Swerdin performed an eye examination
              which revealed inconsistent visual acuities and he noted that
              you provided unreliable answers for determining best
              corrected visual acuity. In his report dated 12/26/00, Dr.
              Swerdin indicated that the vision in your right eye is at least
              20/40 with 20/200 vision in the left eye. There are no
              restrictions or limitations regarding your right eye.

13

|  | We have reviewed the physical requirements of your occupation and have determined that your duties do require near visual acuity. However, the loss of visual acuity in one eye should not preclude you from accommodating your vision to perform the material duties of your occupation. Accordingly, we have determined that you are not eligible for disability benefits. | 133-134 |
|---|---|---|
| 28. | On April 24, 2001, Hamel wrote a memo to the file to summarize a telephone call he had with plaintiff's attorney.  Hamel wrote, "Call to Attorney Fox. Fox said he is handling a personal injury suit for claimant and was only recently made aware of claimant's disability claim. He has additional medical to submit. I told him to submit a letter of representation with medical info for our consideration." | 136 |
| 29. | On May 1, 2001, Hamel wrote to Atty. Fox acknowledging receipt of his letter requesting an additional review of plaintiff's claim. | 137 |
| 30. | By letter dated April 25, 2001, Atty. Fox provided additional medical information to Unum. | 138-185 |
| 31. | Atty. Fox' April 25 letter included a letter to him dated February 22, 2000 from Dr. Sanjeev Nath, in which Dr. Nath wrote "...Patient's vision at this time is fluctuating between 20/25 and 20/50 and this may be related to leakage of fluid in the macula. This is a frequent occurrence in patients with chronic, recurrent inflammation and certainly is aggravated by inadequate usage of steroid medications to control inflammation...." | 179-184 |
| 32. | Atty. Fox' April 25 letter also included a letter to him dated December 21, 1998 from Leslie Eisner, M.D., in which Dr. Eisner wrote, "First seen in office 01/26/98 complaining of 2 week history of redness and light sensitivity in left eye. Did not admit to any past ocular problems or recent history of trauma. Examination at the time revealed best corrected vision of 20/15 in right eye and 20/80 in the left. received treatment 021/29 and 2/29 and was lost subsequently to follow-up. | 158-159 |

14

33.   Atty. Fox' April 25 letters included letters from Dr. Frantz Lerebours:          148

•      Dated April 4, 1998 in which Dr. Lerebours wrote," He has          146
       been in treatment from 2/17/98 for uveitis left eye. His
       condition has not improved significantly and requires frequent
       application of eye drops. At this point, he is not fit for duty."

•      Dated April 13, 1998 in which he wrote "Mr. Dorcely has been          142
       under my care since 2/17/98 for severe uveitis left eye. Mr.
       Dorcely's condition is very serious and will result in
       permanent damage to his left eye if not complete loss of
       vision. At this point, Mr. Dorcely is severely impaired and is
       not fit for duty."

•      Dated April 2, 1998 in which he wrote, "Mr. Dorcely's          140
       condition has not improved significantly, he still requires
       frequent application of eye drops. At this point he is not fit for
       duty."

•      Dated April 16, 1998 in which he wrote, "Mr. Dorcely's          139
       condition is very serious and will resort in permanent damage
       to his left eye. At this point, he is not fit for duty."

34.  On May 1, 2001, Hamel wrote to Atty. Fox to inform him of Unum's     186
     determination.  In part, he wrote:

     We have reviewed the additional medical information you
     submitted on behalf of your client. The information submitted
     consists of an emergency room visit on 01/26/98, records
     from Frantz Lerebours, M.D. for the period of 2/17/98 to
     4/30/98, records from Leslie Eisner, M.D. for the period of
     01/26/98 to 2/9/98 and records from Sanjeev Nath, M.D. for
     the period from 6/5/99 to 2/16/00.

     Mr. Dorcely is claiming to be totally disabled since 2/29/00.
     The policy under which he is covered has a 180 day
     elimination period and he would not have been entitled to
     disability benefits until 8/27/00. The medical information
     referenced above predates his claim and provides no
     information regarding your client's functional capacity at the
     time he might have become entitled to benefits.

     After further review, we find that our previous decision to deny
     benefits was correct and we are upholding that determination.
     This represents the final review of your client's file, and
     therefore, all administrative remedies in regard to Mr.
     Dorcely's appeal and re-appeal for disability benefits have
     been exhausted.

35.  The Policy states that a person covered by its terms suffers from a     301
     "disability" or is "disabled" because of injury or sickness if:

     1.  the insured cannot perform each of the material duties
         of his regular occupation; and

     2.  after benefits have been paid for 24 months, the
         insured cannot perform each of the material duties of
         any gainful occupation for which he is reasonably
         fitted, taking into consideration training, education or
         experience, as well as prior earnings.

16

36.     The Policy defines "Injury" as "bodily injury resulting directly from an     304
        accident and independently of all other causes."

37.     The Policy defines "Sickness" as "illness or disease."     303

38. UBS AG prepared and distributed an Employee Handbook to its    Attached
employees which in summary fashion described the terms of the
Plan.  The court determines that the "Employee Handbook" is a
Summary Plan Description for purposes of ERISA.  The version of
the Summary Plan Description in effect when the plaintiff claimed to
have become disabled contains the following language regarding the
Policy:

> The insurance carrier, UNUM, will determine whether you're
> disabled for plan purposes.  In order for the payments to
> continue, you may be required to furnish proof of your
> continuing disability and show that you're under the direct
> care of a licensed physician.
>
> \*          \*          \*          \*          \*          \*
>
>
> The insurance carrier, UNUM, will provide you with the LTD
> form to apply for benefits if you're on an approved STD and
> are nearing the 26-week maximum STD benefit.  You must
> return this form to the insurance carrier.  UNUM will transfer
> you from STD coverage to LTD coverage if it determines that
> you continue to be disabled after 26 weeks and your disability
> is approved by UNUM....You must give proof, at your own
> expense, that you're disabled....
>
> \*          \*          \*          \*          \*          \*
>
>
> LTD benefits, like Life Insurance and Accidental Death and
> Dismemberment Insurance, are provided through an
> insurance policy to which the Bank and employees make
> premium payments.  **Although the Bank is the Plan**
> **Sponsor of the LTD Plan and makes it available to**
> **eligible employees, the insurance company, UNUM, has**
> **the sole authority to interpret and construe the terms of**
> **the insurance policy (which are described generally**
> **herein) and determine whether benefits are payable**---
> UNUM also has the sole responsibility for making any

18

2.    PROPOSED CONCLUSIONS OF LAW

1.    This court has jurisdiction over the plaintiff's complaint pursuant to the provisions of the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001 *et seq.* as the dispute arises out of an employee welfare benefit plan, 29 U.S.C. §1002(1).

2.    Prior to February 22, 2000, plaintiff was actively employed by UBS AG at its Stamford, Connecticut facility.

3.    At all relevant times, UBS AG provided its employees, including the plaintiff, with long-term disability insurance covered under a policy (the "Policy) issued by First Unum Life Insurance Company ("Unum").  The Policy is a part of an employee benefit plan governed by ERISA.  (The "Plan").

4.    Under the Supreme Court decision in Firestone Rubber Company v. Bruch, 489 U.S. 101, 115 (1989), an ERISA benefits decision is to be reviewed *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

5.    The Plan states that, "UNUM, has the sole authority to interpret and construe the terms of the insurance policy (which are described generally herein) and determine whether benefits are payable."  This language is sufficient to invoke a court's deferential review of Unum's decision.  Maniatty v. UnumProvident Corporation, et al., 218 F.Supp. 2d 500 (S.D.N.Y. 2002), aff'd, 62 Fed. Appx. 413, 2003 U.S. App. LEXIS 9383, cert. den. __ U.S. __, 157 L. Ed. 2d 310, 124 S. Ct. 431, 2003 U.S. LEXIS 7719, 72 U.S.L.W. 3280 (2003)(construing language from the same plan and policy and issued by the same employer as in this case); see also, Pulvers v. First Unum Life Insurance Company, 210 F.3d 89, 92 (2d Cir. 2000) (language granting administrator "discretionary authority to determine ... eligibility for benefits and to interpret the terms and provisions of the policy" is of a kind that "generally prompts the arbitrary and capricious standard of review."); Short v. Unum Life Insurance Company of America,  2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003);  Rosenthal v. First Unum Life Insurance Co., 2002 U.S. Dist. LEXIS 8365, *15-*16 (S.D.N.Y May 9, 2002);  Kocsis v. Standard Insurance Company, 142 F.Supp. 2d 241,251-52 (D. Conn. 2001) (reservation of right to determine eligibility for insurance, entitlement to benefits, amount of benefits and sufficiency of amount of information triggers discretionary review.)

6.     Where the written benefit plan documents give the administrator discretionary authority to determine eligibility for benefits, a court will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious. <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 441 (2d Cir. 1995).

7.     In reviewing an ERISA claim in which the administrator's conduct is judged by the arbitrary and capricious standard, the court's examination of the facts of the case is limited to reviewing the administrative record compiled below. <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1071 (2d Cir. 1995).  In a deferential review case such as this, "a district court reviewing an ERISA denial of benefits is effectively functioning in an appellate capacity because it is precluded from considering new evidence" <u>Larsen v. The Prudential Insurance Company of America</u>, 151 F.Supp. 2d 167, 172 (D.Conn. 2001). The scope of a court's review is "very narrow."  <u>Celardo v. Greater New York Auto. Dealers Health & Welfare Trust</u>, 318 F.3d 142, 146 (2d Cir. 2003);

8.     A denial of benefits is "arbitrary and capricious" if the decision to deny benefits was without reason, was unsupported by substantial evidence, or was erroneous as a matter of law.  <u>Pagan</u>, 52 F.3d. at 442.  "Substantial evidence" means such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker; it requires more than a scintilla, but is less than a preponderance of the evidence. <u>Kocsis</u>, 142 F.Supp. 2d at 252.  "Where both the plan administrator and a spurred claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation **must** be allowed to control." <u>Pulvers v. First UNUM Life Insurance Co.</u>, 210 F.3d 89, 92-93 (2d Cir. 2000)(emphasis added).

9.     Under the deferential standard, the court is "not free to substitute its own judgment for that of the plan's administrator as if it were considering the issue of eligibility anew."  <u>Kocsis</u> at 252.  Thus, the court may not upset a reasonable interpretation of the administrator.  <u>Jordan v. Retirement Commission of Rensselear Polytechnic Inst.</u>, 46 F.3d 1264, 1271 (2d Cir. 1995).

10.    The court has reviewed the administrative record Unum prepared during its review of the plaintiff's claim and is satisfied that plaintiff has not sustained his burden of proof regarding disability.  Indeed, plaintiff's own attending physician, Michael Swerdin, M.D., called the reliability of the medical data he presented to Unum regarding plaintiff's physical condition into question.  In his last office note, Dr. Swerdin wrote, "unreliable answers for determining best corrected V[isual] A[cuity],"  (AR 073), and he told that fact directly to Dr. Lawrence Broda, Unum's medical consultant.  (AR 105-08).

Further, even if plaintiff's vision in his left eye truly was decreased, he provided Unum with no objective information or evidence to show that because of his decreased ability to see through that eye he could not perform the material duties of his position.  As the medical and vocational consultants who reviewed the medical information on behalf of the administrator concluded,  even if plaintiff had a problem with visual acuity in his left eye, he could have placed a patch over that eye and still have been fully capable of performing his duties using only his right eye. (AR 109).  Indeed, the consultants determined that even if plaintiff had totally lost sight in his affected eye he still would have been able to perform the material duties of his position. Id.  The plaintiff has provided no countervailing or contradictory evidence.

As one court recently noted, a claimant's own assessment of his own capacities is not a sufficient basis on which to ground a claim for ERISA benefits.  Maniatty, supra.  In that case, the plaintiff claimed that the language of the policy itself did not require her to produce objective medical evidence of her disability and required Unum to credit her own statements of her disabilities.   The court, however, disagreed.  Commenting, Judge Rakoff held:

the very concept of proof connotes objectivity....It is hardly unreasonable for the administrator to require an objective component to such proof.  To hold otherwise, to require administrators to provide benefits based solely upon subjective complaints of claimants, without more, would result in insurance companies paying virtually all claims.

21

See also, <u>Coffman v. Metropolitan Life Insurance Co.</u>,  217 F. Supp. 2d 715, 732 (D. W.Va. 2002); The First Circuit is in accord with the Second Circuit on this point.  <u>Boardman v. The Prudential Life Ins. Co. of America</u> , 337 F.3d 9 (2003), as are many other courts throughout the country.  See, e.g. <u>Wertheim v. Hartford Life Insurance </u>Co., 2003 US. Dist. LEXIS 10807 (E.D. Va. 2003); <u>Williams v. Unum Life Insurance Company of America</u>, 250 F. Supp. 2d 641, 648 (E.D. Va. 2003); <u>Martin v. Continental Casualty Company</u>, 96 F. Supp.2d 983, 992-94 (N.D. Cal. 2000).

11.     Trustees of ERISA benefit plans are required to maintain and preserve their plan's assets, not to waste them.  See, e.g. <u>New York State Teamsters Conference Pension and Retirement Fund v. Boening Brothers, Inc. et al.</u>, 92 F.3d 127, 131 (2d Cir 1996); see also, <u>Central States, Southeast & Southwest Areas Pension Fund et al. v. Central Transport, Inc.</u>, 472 U.S. 559, 572 (1985).  Requiring a level of objective proof to support claimed restrictions and limitations is consistent with the duties and responsibilities of a claims administrator.  The Court will likewise apply that standard to this case.

12.    Below, plaintiff submitted **no** reliable objective evidence that in February 2000 he was unable to perform any material duty of his regular occupation on account of injury or sickness. The testing performed by Dr. Swerdin, plaintiff's own doctor, suggests that plaintiff may have been malingering. At best, the test results were inconsistent, suggesting that plaintiff may have intentionally over-stated his condition.

Dr. Broda reviewed the medical records Dr. Swerdin provided and in February 2001 observed that:

> Dr. Swerdin can't determine if vision changes [are] real based on patient reliability and has been unable to obtain records from Dr. Nath to see what was his previous vision. Office visit 12/29/00 reveals uncorrected acuity 20/50 right and 20/80 left with refraction. Visual acuity 20/30 right and 20/50 left with questionable reliability. Vision of office visit 12/15/00 uncorrected was 20/60 right and 20/100 left by technician, and when refracted with Dr. Swerdin 20/40 right and 20/200 left which is inconsistent.

(AR 103-04). He then spoke personally with Dr. Swerdin, and heard Dr. Swerdin conclude that:

> His [plaintiff's] eye examinations have been unreliable. His right eye vision is diminished by eye testing which has been compromised by patient reliability. This is in the face of what appears to be a totally normal right eye exam raising questions of patient reliability. In addition to this, on 1/15/00, the claimant had uncorrected vision that was better than his refracted vision. Uncorrected vision on 12/14/00 was 20/60 in the right eye and 20/100 in the left eye. With refraction, the vision was 20/40 in the right eye, 200/200 in the left eye, again raising the question of patient reliability. The fact that his corrected vision is worse than his uncorrected vision is inconsistent.

(AR 108-09).

13.     Finally, Unum gave the plaintiff the benefit of the doubt and conducted a vocational analysis of his position.  It assumed that plaintiff suffered some loss of vision in his left eye, but based on its vocational analysis reasonably concluded that plaintiff, **even if he were blind in one eye**, could have continued to perform the material duties and responsibilities of the position which he held on February 29, 2000.  Id.

14.     Below, the plaintiff did not contest this assessment.  Nothing that plaintiff's former employer provided during the claims process contradicted this assessment.

15.     Based on all the information in the file, the court has determined that the plaintiff has not satisfied his burden of proving disability.  Judgment therefore shall enter for the defendant confirming its administrative determination, and the clerk is directed to close this file.


RESPECTFULLY SUBMITTED,

FIRST UNUM LIFE INSURANCE COMPANY


By:     _____

Alexander H. Schwartz, Esq.(ct 05773)

3695 Post Road, Suite 203

P.O. Box 701

Southport, CT   06480-0701

203.255.9829

203.255.9839 (fax)

alex@ahschwartz.com

## **CERTIFICATION**

I hereby certify that a true copy of the foregoing has been mailed this 15th day of June, 2004, to the following counsel and pro se parties:

Mark J. Fox, Esq.
125 Elm Street
New Canaan, CT 06840

_____
Alexander H. Schwartz