**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ERNST DORCELY,        :  CIVIL ACTION NO:
   Plaintiff,        :
               :
V.              :  3:03 CV 114 (AVC)
               :
FIRST UNUM LIFE INSURANCE COMPANY, :
   Defendant.      :  JUNE 14, 2004

<u>**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**</u>
<u>**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**</u>

_____The defendant, First Unum Life Insurance Company ("Unum") moves that the

court enter judgment confirming its administrative decision to deny the plaintiff's

application for long-term disability benefits.  As this is a case governed by the Employee

Retirement Income Security Act of 1974 ("ERISA"), this court's review of Unum's

decision is based solely on the administrative record it compiled below.  Unum has

previously filed paper and electronic copies of the administrative record.[1]

**I.  SUMMARY OF THE ADMINISTRATIVE RECORD**

   The plaintiff submitted his application for long-term disability benefits to Unum on

May 18, 2000, claiming disability due to an eye condition. (Administrative Record "AR"

---

   [1]  The Second Circuit recognized in its recent decision in <u>Muller v. First Unum
Life Insurance Company</u>, 341 R.3d 119, 124 (2d Cir. 2003) that a motion for judgment
on an administrative record is akin to a bench trial "on the papers," and is an
appropriate way for a district court to review and resolve an ERISA benefits claim.

001-011).  Unum assigned Tracy Balboni, a Disability Benefits Specialist, to process

plaintiff's claim.  Ms. Balboni wrote plaintiff a letter on August 22, 2000 detailing

previous unsuccessful efforts to contact him, enclosed an Attending Physician's

Statement, and told him that he needed to provide Unum with medical information

relating to his condition.[2] (AR 036-37).

Ms. Balboni told the plaintiff that until plaintiff's physician provided medical

records detailing his care and treatment, Unum was not in a position to make a positive

determination on his application or to commence making benefit payments. (AR 039).

Unum also received a detailed description of plaintiff's position from his

employer, UBS AG.  In that description, (AR 047-50), Ruth Ann Shay on behalf of

---

[2]  The Policy states:

2.     *Proof*
       a.     *Proof of claim must be given to the Company.  This must be done*
              *no later than 90 days after the end of the elimination period.*

       *            *                *                *

       b.     *Proof of continued disability and regular attendance of a physician*
              *must be given to the Company within 30 days of the request for the*
              *proof.*

       d.     *The proof must cover:*

              i.     *The date disability started'*
              ii.    *The cause of the disability; and*
              iii.   *How serious the disability is.*

*(AR 288)*

2

plaintiff's employer, described plaintiff's position as sedentary, requiring him to answer

telephone calls, sit daily for six hours, walk for one and one half hours, and to use his

hands to operate equipment such as the telephone and computers. Id.

On September 16, 2000, Tracy Balboni analyzed the plaintiff's application and

noted that

> *Medical records are necessary before review can be done. However, file lacks authorization form to request meds. File contains authorization. However, claimant was put on 30 days notice to provide attending physicians statement and required section E attachments on 8/22/00–as of 8[sic]/25/00 information hasn't been received. T[ele]P[hone] C[all] with claimant done 8/29/00; LTD claim is being denied at present under Notice and Proof. Claimant was sent letter on 8/22/00 requesting Attending Physicians Statement and required Section E attachments with 30 days to provide information. However, as of 9/25/00–no additional medical information has been provided. Therefore, because claim can't be pending indefinitely, claim is being closed. If additional medical info is received, info will be reviewed to determine whether claimant meets definition of disability under policy provisions.*

(AR 51).  Therefore, on September 25, 2000 and because plaintiff did not provide

Unum with appropriate authorizations for it to utilize in obtaining his medical records,

Unum initially denied plaintiff's application for benefits. (AR62-63).  In so doing, Ms.

Balboni wrote:

> *Enclosed you will find a copy of a letter we sent you concerning your claim for Unum disability benefits.  We advised you in that letter that we needed to receive proof of your disability within 30 days of our request.  Since we have not received the requested information within the specified time period we are closing your file in accordance with the following policy provision:*

> **"Notice and proof of claims:**
>
> > **...Proof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for the proof..."**
>
> *If you are still interested in pursuing your claim for disability benefits, please provide us with the necessary information immediately to support your claim for benefits.*

(AR 052-53)(Emphasis in original).

On September 26 and 27, 2000, Ms. Balboni also attempted to contact the plaintiff by telephone to inform him of Unum's decision, but she was unable to do so as plaintiff's telephone was not answered and there was no voicemail or answering machine on which she could leave that message. (AR 054).

Between September and December, Unum did not hear anything from plaintiff and assumed that the claim was closed.  In December, however, the plaintiff began to contact Unum. (AR 058-60).  Despite that plaintiff had not provided sufficient information to support his claim and the claim had been denied on that basis, Unum permitted him to continue pursuing his claim.

On January 19, 2001, plaintiff's physician, Mark Swerdin, M.D., provided Unum with some medical information.  His office faxed Unum office notes describing plaintiff's treatment with him during the period of February 2000 through December 2000. (AR 078-73).  Dr. Swerdin also provided Unum with a hand-written letter dated December 26, 2000, in which he wrote:

*Ernst Dorcely is a 38 year old male who has a past ocular history of trauma to the left eye with cataract removal and posterior chamber intraocular lens implant back in January 2000. He has been followed at my office since February 2000.*

*Medical Records Summary from February 2000 to Present:*
*Mr. Dorcely has at least 20/40 vision right eye with 20/200 vision left eye. The right eye exam is normal. However, in the left eye he has been treated for retinal edema, residual iritis and glaucoma in the left eye causing decreased vision and glare.*

*Activities He Can and Cannot Do:*
*Due to decreased vision in the left eye it may be difficult to perform extensive reading or viewing of a computer screen. Based on his visual acuity, most physical activities could be performed except for operating machinery which can pose a risk.*

*Treatment Plan:*
*Mr. Dorcely is taking 3 different eye drops in the left eye. Voltaren twice a day, Alptoyen twice a day, and Timoptic XE once a day. He will be rechecked March of 2001. At this time it is possible the decreased vision in the left eye may be chronic without any improvement. In 3 months vision will be reevaluated.*

(AR92).

Unum had a vocational review of the plaintiff's position at UBS AG performed.  In

his January 29, 2001 vocational analysis, Douglas Palmer, MS, CRC,[3] wrote that

*[i]t would appear that the claimant's occ[upation] would most [closely] relate to Wire-Transfer Clerk... .The material duties of this occ[upation would] include transferring funds or securities and maintain[ing] records of transactions using computer. [The employer] reported that as the investigator, the wire-transfer [request or follow up] would be as a result of mis-payment or need for additional funds as requested by the client.  Their clients are throughout the world and [employer] indicated that on any given day their office may see over 300 million*

---

[3]  The letters "CRC" in this case indicates that Mr. Palmer holds the degree of "Certified Rehabilitation Counselor" in addition to Master of Science.

*in transfers.  Being an international company, their staff are fluent in other languages*

*The physical demands for this occ[upation] are considered SEDENTARY with occasional lifting up to 10 pounds, frequent fingering, occasional reaching and handling, and sitting up to 2/3rds of the time.  In regards to the visual requirement for this occ[upation], the dictionary of occupational titles reports that frequent near acuity is needed, which is defined as clarity of vision at 20 inches or less.*

(AR 099-100).  Mr. Palmer went on to conclude that plaintiff was not disabled as defined by the Policy.  He wrote that "it would appear reasonable that an individual with loss of vision in one eye could learn to accommodate vision with the other eye that would enable him/her to be able to perform the material and substantial duties of this occupation that would require frequent near acuity with monocular vision."  (AR 109).

Unum also had plaintiff's medical records analyzed.  The first layer of analysts were nurses, Maliea Brackett, R.N. and Ann Pidgen, R.N.  The second layer of analysis was by a physician, Lawrence Broda, M.D.  Analyzing the data and restrictions and limitations, the nurses on February 8, 2001 wrote:

*Clinical Findings: Has history of trauma to left eye. January '00 cataract removal and posterior chamber intraocular lens imprint left eye. As of 2/29/00, visual acuity showed 20/50 in right eye and 20/80 in left eye. As of 12/15/00 visual acuity shows 20/50 in right eye and 20/80+ in left eye.*

*Narrative of 12/26/00: Attending Physician indicates 20/40 in right eye and 20/200 in left eye.*

*Claimant presently on Voltaren, Alphagan, and Timoptic XE.*

6

> *Restrictions and Limitations: Restrictions are extensive reading or viewing of computer screen. Limitations are operating machinery.*

> *Conclusion: The available medical information provided from 2/29/00-12/26/00 does not indicate significant change in claimant's condition, nor would I expect claimant to be totally impaired based on review of these medicals.*

(AR 101-02).

On February 14, 2001, Dr. Broda analyzed the same data and wrote "Inconsistent visual acuities and unknown preop visual acuity," and, as a next step in the review process, indicated that Unum needed to "obtain preop V[isual] A[cuity] from Dr. Sanjeev Nath MD in NYC." On the same day, however, Dr. Broda spoke directly with plaintiff's attending physician, Dr. Swerdin. The results of that conversation directly affected Dr. Broda's perception of the plaintiff's claim.

In his letter later on February 14 to Dr. Swerdin that summarized their earlier telephone call, Dr. Broda wrote of their discussion that:

> *I would like to summarize our conversation as follows: You stated that Mr. Dorcely was first seen by you at the end of 2/00. This followed a prior surgeon's cataract extraction and lens implantation in 1/00. You stated that claimant does have evidence of prior left eye trauma and surgery, as well as some residual retinal edema and iritis of uncertain duration.* **His eye examinations have been unreliable. His right eye vision is diminished by eye testing which has been compromised by patient reliability. This is in the face of what appears to be a totally normal right eye exam raising questions of patient reliability.** *In addition to this, on 1/15/00, the claimant had uncorrected vision that was better than his refracted vision. Uncorrected vision on 12/14/00 was 20/60 in the right eye and 20/100 in the left eye. With refraction, the vision was 20/40 in the right eye, 200/200 in the left eye, again raising the question of patient reliability.* **The fact that his corrected vision is worse than his uncorrected vision is inconsistent. At this time, it is very difficult for you to determine what is**

7

> ***Mr. Dorcely's vision and how this affects his ability to work.*** *You have tried many times to obtain records from his prior eye surgeon, unsuccessfully.*

(AR 105-08)(Emphasis added).[4]

Therefore, on February 16, 2001 Dr. Broda wrote that "while claimant has decreased vision in his left eye, albeit [on] unreliable exams, [he] should be able to read with normal right eye and use computer screen.  If [there are ] problems with biocular vision because of differences between eyes, [he] could use [a] patch to be able to focus with one eye." (AR 102)

Based upon all the information before it in the record, Unum determined that the plaintiff was not disabled under the terms of the Policy, and on February 16, 2001 Ms. Kathleen Reid informed him of that determination.[5]  (AR 114-6).  In that letter she wrote:

> *Your claim for LTD benefits was originally denied on 9/25/00 for failure to provide proof of disability. On 1/19/01, we received office notes from Dr. Swerdin and on 01/25/01 we received a disability statement from him. Dr. Swerdin documented that he has tried without success to obtain medical information from your prior doctor documenting your condition and treatment prior to his treatment. Based on this it is unclear for how long you have had retinal edema and iritis and whether or not you were able to work with your conditions previously.*

---

[4]  By "unreliable," Dr. Broda means that Dr. Swerdin, plaintiff's own physician, reported plaintiff's statements describing his ability to see to be of questionable veracity. The letter further confirms that Dr. Swerdin was unable to determine how plaintiff's vision affected his ability to work, if it had any effect at all.  Certainly, Unum was not obligated to conclude that plaintiff was unable to perform the material duties of his own occupation when his own doctor could not provide an opinion on that subject.

[5]  Kathleen Reid, a Senior Disability Benefit Specialist, took over responsibility for th file from Tracy Balboni in January 2001. See, e.g. AR 064.

*Your visual acuity has been tested during each office visit with Dr. Swerdin, and he has documented the unreliability of your answers. Specifically, on December 15, 2000 [you had] uncorrected vision of 20/60 in your right eye and 20/100 in your left eye. With refraction, your right improved to 20/40, however, your left eye worsened to 20/200 which is inconsistent.*

*At this time, we have no objective evidence to support you have any restrictions or limitations regarding your right eye. Again, due to the fact there is no medical in the file prior to February 29, 2000, there is no indication when the retinal edema and iritis developed in your left eye.*

*Furthermore, we have reviewed your occupation prior to your disability and have determined that you are performing the material duties of a Wire Transfer Clerk (DOT # 203.562-010) which does require frequent near acuity. However, it is reasonable that with a reported loss of vision in one eye, an individual could accommodate their vision to perform the material duties of this occupation.*

*Therefore, at this time, we do not have objective evidence to support you would have restrictions and limitations due to your eyesight that would prevent you from performing the material duties of your regular occupation. We are denying all liability as of the date of this letter and no benefits will be payable to you.*

*If you have new, additional information to support your request for disability benefits, please send it to my attention at the address noted on this letterhead.*

(AR 115-16).

On February 19, 2001, Ms. Reid telephoned plaintiff to inform him of Unum's decision. In that conversation, Ms. Reid again informed plaintiff of the appeals procedure. (AR 120).

On February 22, 2001, plaintiff "appealed" Unum's decision via an eight page fax in which, on the cover sheet, he wrote, "I'm appealing latest decision on my claim, and request immediate payment. I am submitting further particulars. However, you should

9

contact doctor or doctors for more if needed." (AR 122-29).  Along with that fax cover sheet, the plaintiff submitted Explanation of Benefits forms he received from his medical insurer detailing medical benefits payments it made to Sanjeev Nath, M.D. for five outpatient visits with Dr. Nath (AR 128, 125, 123, 122); documents indicating that plaintiff received treatment at the New York Eye and Ear Infirmary on June 17, 1999 (AR 127), from an Edward H. Stroh, M.D. on September 8, 1999 (AR 126), and from a Roger Lash, M.D. on June 17, 1999 (AR 125).  None of those documents contained **any** description of **any** treatment plaintiff received.

By her February 24, 2001 letter, Ms. Reid acknowledged receiving plaintiff's request for an appellate review. (AR 130).  At the same time, Ms. Reid noted that since plaintiff did not submit any new medical information along with his appeal, his claim file was being sent to Unum's Quality Performance Support Unit for the completion of the appellate review process.  Id. [6]

On March 16, 2001 and after reviewing the claims file, Ronald Hamel, Unum's Senior Appeals Specialist in the Quality Performance Support Unit, informed the plaintiff in writing that Unum had determined that the decision to deny his claim was appropriate. (AR 134).  Mr. Hamel wrote:

_____

[6]  As is more fully discussed below at p. 17, both the Policy and the law require the claimant to provide the administrator with sufficient proof of his disability. Therefore, Unum had no duty to develop the record below.  This burden at all times fell exclusively on the plaintiff.  See, e.g., <u>O'Sullivan v. The Prudential Insurance Company of America</u>, 2002 U.S. Dist. LEXIS 5349 (S.D.N.Y. 2002)

*According to the policy under which you are covered:*

*"Disability" and "disabled" mean that because of injury or sickness:*

> *1) the insured cannot perform each of the material duties of his regular occupation; and*

> *2) after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience.*

*Since you have not submitted any new medical information for your appeal, this decision is based on a thorough review of the information currently in your file.*

*As outlined in our previous correspondence to you dated February 16, 2001, the objective medical evidence does not support that you are incapable of performing the material duties of your regular occupation. The medical records from Dr. Swerdin indicate that you have a history of eye trauma to the left eye with cataract removal and insertion of an intraocular lens implant. Your left eye has been treated for retinal edema, residual iritis and glaucoma. On examination, your right eye is normal.*

*On December 15, 2000, Dr. Swerdin performed an eye examination which revealed inconsistent visual acuities and he noted that you provided unreliable answers for determining best corrected visual acuity. In his report dated December 26, 2000, Dr. Swerdin indicated that the vision in your right eye is at least 20/40 with 20/200 vision in the left eye. There are no restrictions and limitations regarding your right eye.*

*We have reviewed the physical requirements of your occupation and have determined that your duties do require near visual acuity. However, the loss of visual acuity in one eye should not preclude you from accommodating your vision to perform the material duties of your occupation. Accordingly, we have determined that you are not eligible for disability benefits.*

(AR 133).

11

After Unum notified plaintiff of its determination, plaintiff's attorney notified Unum that he had "additional medical" information to submit which, Unum told him, it would consider in further reviewing plaintiff's claim.  (AR 136).

This new and additional medical information came in counsel's letter of April 25, 2001. (AR 138-85).  That information consisted of a report dated February 11, 2000, from Sanjeev Nath, M.D. (AR 160-84); a report from Leslie Eisner, M.D. dated December 21, 1998; and reports and office notes of Frantz Lerebours, M.D. (AR 138-55).  Dr. Nath's report and records indicate that plaintiff treated with him between June 5, 1999 and February 2, 2000.[7] Id.  Dr. Eisner's report indicates plaintiff treated there on January 26, January 29 and February 9, 1998. (AR 159-58).[8]  Dr. Lerebours' notes and records indicate that he treated plaintiff between February 27, 1998 and April 30, 1998.

After reviewing the newly-submitted medical records, Hamel wrote to plaintiff's attorney to notify him that it was upholding its prior denials.  Hamel wrote:

> *Mr. Dorcely is claiming to be totally disabled since February 29, 2000.  The policy under which he is covered has a 180 day elimination period and he would not have been entitled to disability benefits until August 27, 2000.  The medical information* [from Drs. Nath, Eisner and Lerebours] *predates his claim and*

---

[7]  Dr. Nath's report also contains the following summary of his observations: "**Patient's vision** [in the left eye] **is fluctuating between 20/25 and 20/50** and this may be related to the leakage of fluid in the macula.  This is a frequent occurrence in patients with chronic, recurrent inflammation and certainly is aggravated by inadequate usage of steroid medications to control the inflammation.  (AR179)(emphasis added).

[8]  Dr. Eisner wrote that "I have seen a number of cases of this type which all eventually resolve with minimal residual disability." (AR158).

12

> *provides no information regarding your client's functional capacity at the time he might have become entitled to benefits.*

(AR186).  Unum notified plaintiff and his attorney that the plaintiff had exhausted all his administrative remedies. Id.

Thereafter, the plaintiff filed this action.

## II. STANDARD OF REVIEW FOR ERISA DETERMINATION

A denial of benefits challenged under ERISA §1132(a)(1)(B) should be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989);  Celardo v. Greater New York Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003); Short v. Unum Life Insurance Company of America,  2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003).

In this case, the employee handbook that the plaintiff received from his employer, UBS AG, contained the following language:

> The insurance carrier, UNUM, will determine whether you're disabled for plan purposes.  In order for the payments to continue, you may be required to furnish proof of your continuing disability and show that you're under the direct care of a licensed physician.

> The insurance carrier, UNUM, will provide you with the LTD form to apply for benefits if you're on an approved STD and are nearing the 26-week maximum STD benefit.  You must return this form to the insurance carrier.  UNUM will transfer you from STD coverage to LTD coverage if it determines that you

13

continue to be disabled after 26 weeks and your disability is approved by UNUM....You must give proof, at your own expense, that you're disabled....

LTD benefits, like Life Insurance and Accidental Death and Dismemberment Insurance, are provided through an insurance policy to which the Bank and employees make premium payments. **Although the Bank is the Plan Sponsor of the LTD Plan and makes it available to eligible employees, the insurance company, UNUM, has the sole authority to interpret and construe the terms of the insurance policy (which are described generally herein) and determine whether benefits are payable**---UNUM also has the sole responsibility for making any disability benefit payments.

This language is identical to the language one court relied upon in concluding that it would review Unum's decision under the heightened, arbitrary and capricious standard.   Maniatty v. UNUM Provident Corporation, et al., 218 F. Supp. 2d 500, 502-3 (S.D.N.Y. 2002), aff'd 2003 U.S. App. LEXIS 9383 (2d Cir. 2003), cert. den. __ U.S. __, 157 L. Ed. 2d 310, 124 S. Ct. 431, 2003 U.S. LEXIS 7719, 72 U.S.L.W. 3280 (2003). Indeed, language in Maniatty was provided by the same employer and contained in the same employee benefit plan that is at issue in this case.  Compare, 218 F. Supp. 2d 502 with AR 309.  There is no reason why this court should construe the language any differently.

Other courts have reviewed similar language in other Unum long term disability policies and found that language sufficient to invoke those courts' deferential review of Unum's determination. Pulvers v. First Unum Life Insurance Company, 210 F.3d 89, 92 (2d Cir. 2000) (language granting administrator "discretionary authority to determine...eligibility for benefits and to interpret the terms and provisions of the policy"

14

is of a kind that "generally prompts the arbitrary and capricious standard of review.");

<u>Short</u>, 2003 U.S. Dist. LEXIS, *17; (quoting identical language); <u>Rosenthal v. First</u>

<u>Unum Life Insurance Co</u>., 2002 U.S. Dist. LEXIS 8365, *15-*16 (S.D.N.Y May 9,

2002)(interpreting identical language);   See also, <u>Kocsis v. Standard Insurance</u>

<u>Company</u>, 142 F. Supp. 2d 241, 251-52 (D. Conn. 2001)(reservation of right to

determine eligibility for insurance, entitlement to benefits, amount of benefits and

sufficiency of amount of information triggers discretionary review).[9]

In reviewing an ERISA claim in which the administrator's conduct is judged by

the arbitrary and capricious standard, a court's examination of the facts of the case is

limited to reviewing the administrative record compiled below. <u>Miller v. The United</u>

<u>Welfare Fund</u>, 72 F.3d 1066, 1071 (2d Cir. 1995). The scope of review is "very narrow."

See <u>Celardo</u>, 318 F.3d at 146; <u>Peterson v. Continental Casualty Co.</u>, 282 F.3d 112, 117

(2d Cir. 2002).  In a deferential review case such as this, "a district court reviewing an

ERISA denial of benefits is effectively functioning in an appellate capacity because it is

---

[9] When Unum filed its first Motion for Judgment on the Administrative Record in November, 2003, it did not have the language contained in the employee handbook between UBS AG and the plaintiff available to it.  While preparing the court-ordered Joint Trial Memorandum, plaintiff provided Unum with the "Summary of disability coverage" he proposed to admit at trial.  See, Joint Trial Memorandum §9.  Unum has attached the plaintiff's proposed trial exhibit in this case to its contemporaneous Motion for Judgment on the Administrative Record.   It establishes the plan's intent to grant discretion to Unum sufficient to trigger the deferential standard of review.

precluded from considering new evidence." Larsen v. The Prudential Insurance Company of America, 151 F.Supp. 2d 167,172 (D. Conn. 2001).

A court may overturn an ERISA administrator's decision to deny benefits "only if the decision to deny benefits was without reason, was unsupported by substantial evidence, or was erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d.Cir. 1995). "Substantial evidence" means such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker; it requires more than a scintilla but is less than a preponderance of the evidence. Celardo, 318 F.3d at 146 (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995); Kocsis, 142 F.Supp. at 252. "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." Pulvers, 210 F.3d 92-93. In a situation where a reviewing court finds it necessary to choose between two competing yet reasonable interpretations of a pension plan, the court **must** accept that which is offered by the administrator. Pagan, supra. at 443. (Emphasis added). Under the deferential standard of review, the court is "not free to substitute its own judgment for that of the plan's administrator as if it were considering the issue of eligibility anew." Kocsis, at 252. Thus, the Court may not upset a reasonable interpretation of the administrator. Jordan v. Retirement Commission of Rensselear Polytechnic Inst., 46 F.3d 1264, 1271 (2d, Cir. 1995); Short, supra..

16

### III.    DISABILITY

The burden of establishing "disability," as that phrase is defined in the Policy, rests with the plaintiff. O'Sullivan v. The Prudential Insurance Company of America, 2002 U.S. Dist. LEXIS 5349 (S.D.N.Y. 2002).  Therefore, to be eligible to obtain long-term disability benefits from Unum, plaintiff, during the claims process, must have demonstrated to the administrator that because of injury or sickness:

1)    The insured cannot perform each of the material duties of his regular occupation; and

2)    After benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience.

(AR 30).[10]

To satisfy his proof, plaintiff either submitted to Unum, or permitted Unum to acquire on its own, medical records from his treating physicians.[11]  The sum total of the data contained in those documents, and the process Unum undertook in examining the

---

[10]  The plaintiff sought benefits and Unum reviewed his application using the first definition of "disability."  Because the issue of plaintiffs' "disability" under the second definition was not presented to the administrator, the court lacks jurisdiction to review a claim for benefits beyond the first 24 months of benefits.  Peterson v. Continental Casualty Company, 282 F.3d 112, 117-118 (2d Cir. 2002).

[11] The Plan puts the duty upon the claimant to provide Unum with proof that he was "disabled due to sickness or injury." See n. 1, supra.

data contained in those documents, demonstrates that Unum's decision was not
arbitrary or capricious.

**IV.    UNUM IS ENTITLED TO JUDGMENT BECAUSE PLAINTIFF CANNOT
ESTABLISH THAT ITS DECISION TO DENY BENEFITS WAS NOT
SUPPORTED BY SUBSTANTIAL EVIDENCE**

   **a.    The Process Unum Undertook in Reviewing Plaintiff's Application
   was Rational and Appropriate.**

Unum's review of the plaintiff's claim for disability benefits was multi-layered.  It
involved separate medical reviews of all the evidence in the administrative record by
nurses,  Maliea Brackett, RN and Ann Pidgen, RN, and a physician, Lawrence Broda,
M.D.  It performed a vocational analysis of plaintiff's position.  After it determined that
plaintiff was not disabled, Unum, through a separate decision-making unit, performed a
further review of all the available evidence, and the plaintiff was allowed to submit any
new medical information he wished during that review.  Different benefits analysts at
Unum reviewed the medical and non-medical materials in the record.  All in all, at least
seven  different people were involved in the decision to deny plaintiff's application, the
review by Unum's quality support unit, and Unum's administrative affirmance of the
denial.

Furthermore, Unum did not predicate its decision on one single piece of
evidence to the exclusion of all others.  It came to the conclusion that the plaintiff was
not disabled only after reviewing all the information in plaintiff's file and assessing Dr.

18

Swerdin's inability or unwillingness to provide Unum with objective medical data to support plaintiff's disability claim.    Commenting on a similar process in a case involving an ERISA dispute, Judge Hall recently held that, "the court cannot consider [this type of process] nor could a reasonable jury find, such a process to be one without reason." Kocsis, 142 F. Supp. 2d 253.  Unum submits that its decision, just like the fiduciary's decision affirmed in Kocsis, supra, is amply supported by evidence that a reasonable mind can accept as adequate to support the decision to deny the plaintiff disability benefits.  Id.  See also, Mormile v. Metropolitan Life Insurance Company, et al. 91 F. Supp.  2d 492, 496 (D. Conn. 2000).

Judge Hall's decision in Kocsis, supra, can apply with equal force in examining the facts presented in this case.

> In short, the record demonstrates that [Unum] conducted a thorough review of the medical records of the plaintiff and the opinions of his treating physicians...and arrived at a decision, on the basis of the standards in the [Policy], with which the plaintiff and perhaps his treating physicians disagree. This disagreement, however, does not render [Unum's] denial of benefits erroneous as a matter of law or otherwise arbitrary or capricious.  Regardless of how another reasonable mind might have arrived at a decision on the plaintiff's eligibility for disability benefits...the court is not free to substitute its own judgment, or that of another medical professional, for that of [Unum], as the Plan's administrator, as if the court were considering the plaintiff's eligibility anew.  The court can not, and in this instance will not, upset a reasonable interpretation by the Plan's administrator.

142 F. Supp. 2d 253.

**b.    Plaintiff's Inability to Provide Unum with Objective Evidence Supporting His Claim of Disability Demonstrates That the Decision Not to Extend Benefits into the "Any Occupation" Period Was Legally and Substantively Correct**

The record is clear that Unum ultimately opted to credit the vocational reports of Douglas Palmer and Dr. Swerdin's inability to support plaintiff's disability claim over plaintiff's subjective statements of his work capacity.  This methodology is not evidence of arbitrary or capricious conduct.  See, Short, supra. *32.  Indeed, it is exactly what an ERISA administrator should do.  To be sure, the Supreme Court expressly has held that an ERISA administrator may credit reliable evidence and reject without explanation the opinion of a claimant's treating physician.  The Black & Decker Disability Plan v. Nord, __U.S.__, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003).  Moreover, it is not arbitrary, capricious or even unreasonable for a plan administrator to demand objective evidence to support the existence and nature of claimed restrictions and limitations. While plaintiff's self-reported symptoms and subjective reports are relevant in considering whether to grant benefits, plan administrators are not obligated to accord special weight to those subjective reports.

Dr. Swerdin, plaintiff's own physician, did not support plaintiff's claim and, in providing medical information to Unum, even questioned the reliability of the data regarding the plaintiff's left eye.  In his last office note, Dr. Swerdin wrote, "unreliable answers for determining best corrected V[isual] A[cuity]," (AR 073), and he told that

20

fact directly to Dr. Broda, Unum's medical consultant.  (AR 105-08).  Further, even if plaintiff's vision in his left eye truly was decreased, he provided Unum with no objective evidence to show that he could not perform the material duties of his position because of his decreased ability to see through that eye.  As the experts who reviewed the medical information on behalf of the administrator concluded, even if plaintiff had a problem with visual acuity in his left eye, he could have placed an eye patch over that eye and still have been fully capable of performing his duties. (AR 109).

As one court recently noted, a claimant's own assessment of his own capacities is not a sufficient basis on which to base a claim for ERISA benefits.  In Maniatty, supra. the district court dealt with and discussed the type of proof that was necessary to support a claim for benefits under the same long-term disability policy that is at issue here.  In that case, the plaintiff claimed that the language of the Policy did not require her to produce objective medical evidence of her disability and required Unum to credit her own statements of her disabilities.  The court, however, disagreed.  Commenting, Judge Rakoff held;

> the very concept of proof connotes objectivity....It is hardly unreasonable for the administrator to require an objective component to such proof.  To hold otherwise, to require administrators to provide benefits based solely upon subjective complaints of claimants, without more, would result in insurance companies paying virtually all claims.

Id. See also, <u>Boardman v. The Prudential Insurance Company of America</u>, 2003 U.S. App. LEXIS 14672 (July 23, 2003)(ERISA claimant must produce objective evidence of disability. Subjective complaints are insufficient).

The holdings in <u>Maniatty</u> and <u>Boardman</u> are but two very recent opinions in a long line of cases that recognize the centrality of "objective" evidence to an ERISA administrator's determination to pay disability benefits. Trustees of ERISA benefit plans are required to maintain and preserve their plan's assets, not to waste them. See, e.g. <u>New York State Teamsters Conference Pension and Retirement Fund v. Boening Brothers, Inc. et al.</u>, 92 F.3d 127, 131 (2d Cir 1996); see also, <u>Central States, Southeast & Southwest Areas Pension Fund et al. v. Central Transport, Inc.</u>, 472 U.S. 559, 572 (1985). Requiring a level of objective proof to support claimed restrictions and limitations is consistent with the duties and responsibilities of a claims administrator. Applying that level of objective proof to this case results in the inescapable conclusion that Unum's decision below must be upheld here.

Below, plaintiff submitted **no** reliable objective evidence that in February 2000 he was unable to perform **any** material duty of his regular occupation on account of injury or sickness. The testing plaintiff's own doctor performed suggested that plaintiff may have been malingering.[12] At best, the test results were inconsistent, suggesting that

---

[12] On February 2, 2000, shortly before plaintiff's first examination by Dr. Swerdin, Dr. Nath wrote plaintiff's attorney that "patient's vision [in the left eye between June 5, 1999 and February 2, 2000] is fluctuating between 20/25 and 20/50." This

plaintiff may have intentionally over-stated his condition.[13]  In either case, the medical

evidence plaintiff himself provided did not support his claim.

Dr. Broda reviewed the medical records Dr. Swerdin provided and in February

2001 observed that

> *Dr. Swerdin can't determine if vision changes [are] real based on patient reliability and has been unable to obtain records from Dr. Nath to see what was his previous vision. Office visit 12/29/00 reveals uncorrected acuity 20/50 right and 20/80 left with refraction. Visual acuity 20/30 right and 20/50 left with questionable reliability. Vision of office visit 12/15/00 uncorrected was 20/60 right and 20/100 left by technician, and when refracted with Dr. Swerdin 20/40 right and 20/200 left which is inconsistent.*

(AR 103-04).  He then spoke personally with Dr. Swerdin, and heard Dr. Swerdin

conclude that:

> *His [plaintiff's] eye examinations have been unreliable. His right eye vision is diminished by eye testing which has been compromised by patient reliability. This is in the face of what appears to be a totally normal right eye exam raising questions of patient reliability.  In addition to this, on 1/15/00, the claimant had uncorrected vision that was better than his refracted vision.  Uncorrected vision on 12/14/00 was 20/60 in the right eye and 20/100 in the left eye.  With refraction, the vision was 20/40 in the right eye, 200/200 in the left eye, again*

_____

statement appears to differ markedly with the results of eye testing plaintiff had soon afterward with Dr. Swerdin.  Further, the February 2 results cast substantial doubt on the veracity of those later tests.  See fn. 2, supra.  The fact that Dr. Swerdin repeatedly asked plaintiff to get him Dr. Nath's records and plaintiff continued to fail to do that could further support the conclusion that Unum and Dr. Swerdin entertained, to wit: that plaintiff may have been malingering.  (AR 077, 073)

[13] The administrative record contains evidence that in February, 2000, plaintiff was concerned that he was about to lose his job (AR 120).  Thus, Unum reasonably could have concluded that plaintiff's disability claim may have been motivated by factors other than his inability to see properly. (AR 119-20)

> *raising the question of patient reliability. The fact that his corrected vision is worse than his uncorrected vision is inconsistent.*

(AR 108-09).

Finally, Unum gave the plaintiff the benefit of the doubt and conducted a vocational analysis of his position. It assumed that plaintiff suffered some loss of vision in his left eye, but based on its vocational analysis reasonably concluded that plaintiff, **even if he were blind in one eye**, could have continued to perform the material duties and responsibilities of the position which he held on February 29, 2000. The plaintiff did not contest this assessment, and nothing that plaintiff's former employer provided to Unum during the claims process contradicted this assessment.

## V.     CONCLUSION

For all the foregoing reasons, Unum's administrative determination should be confirmed; the Court should grant Unum judgment on the administrative record; and the complaint should be dismissed.

24

RESPECTFULLY SUBMITTED,
FIRST UNUM LIFE INSURANCE
COMPANY


By: _____
Alexander H. Schwartz, Esq.(ct 05773)
3695 Post Road, Suite 203
P.O. Box 701
Southport, CT   06480-0701
203.255.9829
203.255.9839 (fax)
alex@ahschwartz.com

_____**CERTIFICATION**_____


     I hereby certify that a true copy of the foregoing has been mailed this 15th day of June, 2004, to the following counsel and pro se parties:

Mark J. Fox, Esq.
125 Elm Street
New Canaan, CT 06840




_____
Alexander H. Schwartz

25